**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

CASE NO.:_____

PAUL MARTINELLI and
STICKMAN PRODUCTIONS, INC.,

      Plaintiffs,

v.

CIALDINI INSTITUTE LLC and
BAS WOUTERS,

      Defendants,

_____/

## COMPLAINT FOR DAMAGES

Plaintiffs, PAUL MARTINELLI and STICKMAN PRODUCTIONS, INC, by undersigned counsel, hereby file this Complaint against Defendants, CIALDINI INSTITUTE LLC and BAS WOUTERS, and allege the following:

## INTRODUCTION

1.    Plaintiffs assert claims for unjust enrichment, promissory estoppel, and conversion to recover more than $1.4 million in cash and services provided to the Defendants from May 2022 through August 2023.

## PARTIES, JURISDICTION AND VENUE

2.    This is an action for damages in excess of $1.4 million, exclusive of interest, costs and attorney's fees.  As set forth below, the Plaintiffs 'states of citizenship are diverse from the Defendants 'states of citizenship.  Accordingly, diversity of citizenship is present under 28 U.S.C. §1332.

3.      The Plaintiff, PAUL MARTINELLI, is a successful businessman and entrepreneur who is a resident of Palm Beach County, Florida and a citizen of Florida.

4.      The Plaintiff, STICKMAN PRODUCTIONS, INC. (hereinafter "Plaintiff" or "Stickman"), is a Florida corporation with its principal place of business in Palm Beach County, Florida.

5.      The Defendant, CIALDINI INSTITUTE LLC, is a Delaware Limited Liability Company with its principal place of business at 2248 S Forest Ave, Tempe, Arizona.

6.      The Defendant, BAS WOUTERS (hereinafter "Defendant" or "Mr. Wouters), serves as the President and Chief Executive Officer of CIALDINI INSTITUTE LLC and is a citizen of Netherlands.

7.      The Defendants subjected themselves to the jurisdiction of Florida courts by: (a) breaching a contract in this state by failing to perform acts required by the contract to be performed in Florida; (2) operating, conducting, engaging in, and carrying on a business or business venture in Florida or having an office or agency in Florida; (c) engaging in substantial and not isolated activity in Florida; and (d) committing a tortious act in Florida.

8.      From May 2022 through September 2023, Defendants knowingly and purposefully established extensive and meaningful contacts and business relations with the Plaintiffs in Palm Beach County, Florida as "Partners" in the creation, launch and marketing of a global business enterprise called "Cialdini Institute LLC."   Importantly, the Defendants' attorney admitted in writing that the "parties agree that CI [Cialdini Institute] will mostly be operating from the state of Florida."   Among other contacts to Florida, CIALDINI INSTITUTE LLC retained a Florida CPA to prepare the company's 2022 Federal Tax Return.

2

9.      Through misrepresentations, omissions, false promises and assurances made by the Defendants to Plaintiffs in Florida, Defendants induced Plaintiffs to wire from their Florida bank $500,000 in cash to Defendants; incur nearly $600,000 in expenses in Florida; and provide $720,000 in personal services from the Plaintiffs 'Palm Beach County, Florida home and offices. Defendants' wrongful acts also induced the Plaintiffs to put aside their successful and profitable business teaching their own Sales Master Class program, coaching, speaking and mentoring thousands of clients worldwide in order to devote most of their time and resources to building and launching the Defendants' business.

10.     In June through late July 2023 — after dozens of promises that a formal contract would be executed to memorialize the "Partnership" — Defendants materially changed the terms of their agreement and how the parties had been operating by presenting contracts that contained unacceptable terms and conditions that had never been discussed or agreed upon.

11.     When Plaintiffs refused to sign the unacceptable contracts and demanded reimbursement of the more than $1.4 million in net funds and services performed by the Plaintiffs in Florida, the Defendants failed and refused to reimburse the Plaintiffs for the 15 months of money and services provided in Florida to build, launch, market and sell the Cialdini Institute LLC and its program.  In short, Defendants made promises and wrongfully induced Plaintiffs to provide more than $1.4 million in cash, payments for expenses, and personal consulting services to build Defendants' profitable business, but refused to reimburse or compensate Plaintiffs.

12.     Defendants 'purposeful and extensive activities and contacts with the Plaintiffs in Florida easily satisfy the requirements to establish long-arm jurisdiction pursuant to Fla. Stat. §48.193 and personal jurisdiction over the Defendants in Florida pursuant to federal due process

requirements.

13.     Venue is proper in this Court pursuant to 28 U.SC. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in Palm Beach County, Florida.

## FACTUAL ALLEGATIONS

14.     Plaintiff, PAUL MARTINELLI, is an internationally acclaimed speaker, trainer, mentor and coach who built six multi-million dollar companies with sales exceeding $1 billion, and has clients in more than 162 countries throughout the world.  Mr. Martinelli also created and operates Empowered Living, a social media platform with more than 2.3 million followers.  Mr. Martinelli — who resides and works in Palm Beach County, Florida — is President of Plaintiff, STICKMAN PRODUCTIONS, INC., which has its principal place of business in Jupiter, Florida.

15.     DR. ROBERT CIALDINI (hereinafter "Dr. Cialdini") is a New York Times best-selling author and speaker whose books on the science of persuasion have sold more than seven million copies in 48 languages.  Dr. Cialdini is a Member and part-owner of the Defendant, CIALDINI INSTITUTE LLC and the self-described "Partner" of Defendant, BAS WOUTERS.

16.     Known as the "Godfather of Influence," Dr. Cialdini's ground-breaking research on why people comply with requests in business settings led to his best-selling book *Influence: Science and Practice,* which Warren Buffet has called "one of the best business books of all time." Dr. Cialdini is an internationally known speaker who is often paid more than $50,000 to speak on the science of persuasion to individual groups and leading companies, including Google, Microsoft, Coca-Cola, IBM and others.

17.     Defendant, BAS WOUTERS, is President and Chief Executive Officer of the CIALDINI INSTITUTE LLC.  Previously, Mr. Wouters was the part-owner of a kitchen appliance

4

company, the co-author of what he claims to be a "best-selling" book, *Online Influence*, and the founder in 2020 of a business called "Online Influence Institute" based in the Netherlands. According to his LinkedIn profile, Mr. Wouters was "personally trained by Robert Cialdini, Ph.D [in 2017] to become the only Cialdini Method Certified Trainer of the Netherlands."

**Defendants First Retain Mr. Martinelli to Provide Consulting Services**

18.    In or about March 2022, Dr. Cialdini and Mr. Wouters advised Mr. Martinelli that they were planning to form and launch a company, the Cialdini Institute, to provide professionals, coaches, trainers, speakers, companies and universities with comprehensive programs that use the science of influence to drive positive outcomes.

19.    Dr. Cialdini told Mr. Martinelli he had been working with a trainer and author, Defendant Wouters, to create and develop the "Cialdini Institute" in order to expand the reach of Dr. Cialdini's work on a global basis through the digital world.

20.    Although Mr. Wouters had written a book, *Online Influence*, and had some experience in digital marketing, Dr. Cialdini told Mr. Martinelli that he wanted to retain Mr. Martinelli on a consulting basis to share his experience, expertise and techniques with Mr. Wouters on how to build and market the Cialdini Institute on a world-wide scale.

21.    Mr. Martinelli had previously co-founded, owned and served as President of The John Maxwell Team — the world's largest certification company with more than 45,000 members worldwide and sales of more than $500 million.   Like Dr. Cialdini, John C. Maxwell was a New York Times best-selling author, but Mr. Maxwell has sold more than 24 million books in 50 languages and is often called the country's No. 1 authority on leadership skills.   Mr. Martinelli helped build, launch and operate the same global business for Mr. Maxwell that Dr. Cialdini hoped

to create based on his best-selling books and principles of persuasion.

22.     At the time Mr. Martinelli was retained as a consultant to advise the Defendants, the Cialdini Institute LLC had not yet been formed, had no assets, no income, no business plan, and was nothing other than a dream of Dr. Cialdini and his understudy and friend, Mr. Wouters.

23.     Mr. Martinelli had great respect for Dr. Cialdini and his *Principles of Persuasion* so he initially agreed (for a consulting fee of $20,000) to spend two days with Mr. Wouters at his Jupiter, Florida home discussing Mr. Wouters 'plans for the Cialdini Institute and to offer his expertise on how to build, publicize, market and sell the Cialdini Institute and its program on a global scale.

24.     In late May 2022, Mr. Wouters — who lived in the Netherlands — traveled to Mr. Martinelli's Florida home for two days of intensive discussions to develop the vision and structure of the Cialdini Institute.  After spending just a few hours with Mr. Wouters, Mr. Martinelli quickly realized that Mr. Wouters had minimal experience or skills required to transform Dr. Cialdini's best-selling books and revolutionary "principles of persuasion" into a successful and profitable global sales and marketing company.

25.     During the two-day consulting session in Florida, Mr. Martinelli provided Mr. Wouters with a detailed plan for building, marketing and selling the Cialdini Institute program, with extensive instructions on how to create and execute the business.

### Defendant Asks Mr. Martinelli to Become a "Partner" in the Cialdini Institute

26.     Despite Mr. Wouters shortcomings and inexperience, Mr. Martinelli —  based on his previous success with the John Maxwell Team business — recognized the great potential in marketing and selling Dr. Cialdini's principles of persuasion and offered to loan money for the

venture which could be converted into equity in the new company.  Mr. Martinelli also agreed to help Mr. Wouters on a consulting basis (Mr. Martinelli's standard consulting fee was $1,000 per hour).

27.     However, Mr. Wouters said he was so impressed with Mr. Martinelli's presentation that he would prefer to have Mr. Martinelli join the new venture as a "Partner" with Mr. Wouters and Dr. Cialdini.  At the time, Mr. Martinelli was busy marketing and selling his own Sales Master Class program that had been very profitable in the prior two years, but said he would consider putting aside his own sales program to join the Cialdini Institute as a Partner with Dr. Cialdini and Mr. Wouters on certain conditions.

**Mr. Wouters and Dr. Cialdini Agree to Mr. Martinelli's Terms and Conditions**

28.     From their very first meeting at his Florida home in May 2022, Mr. Martinelli advised Mr. Wouters that he would _**only**_ be willing to join the proposed Partnership with Dr. Cialdini and Mr. Wouters to build and launch the Cialdini Institute on certain conditions:

(1)     Mr. Martinelli and Stickman would help fund, build and launch the Cialdini Institute — including creating the content for the Cialdini Sales Master Class — if Plaintiffs were granted an exclusive license to market and sell the Official Cialdini Sales Master Class for at least the period of time necessary to recoup the substantial capital, time and resources Mr. Martinelli would have to invest in the Cialdini Institute; and

(2)     Mr. Martinelli and Mr. Wouters would _**co-manage[1] the company with equal**_

---

[1] Mr. Martinelli's co-management authority was a critically important condition because his profit participation was to be based on the net profit from the business whereas Dr. Cialdini and Mr. Wouters were to be paid first from the gross revenue.  Mr. Martinelli insisted — and Mr. Wouters agreed — that Mr. Martinelli must have equal say on financial and operational issues since he would not benefit unless the business generated "net profits."  This was always understood to be a critical condition for his participation and Mr. Wouters and Mr. Martinelli operated the business on those terms from the first day until the Defendants unilaterally changed the agreement in June 2023.

*management fees* and both would have to approve all decisions regarding budgets, expenses, contracts, partnerships, the sales program, and other critical company operations, but Dr. Cialdini could have the final word (he would be the "tie-breaker") if Mr. Martinelli and Mr. Wouters could not agree on any major issues that would affect the net profitability of the business; and

(3)     Dr. Cialdini would have to commit to certain minimum appearances and activities necessary to successfully launch and grow the business, including: live webinars; live events (personal appearances) per year; monthly video calls or question-and-answer sessions with clients and potential clients; send emails or participate in occasional phone calls to major potential affiliates or clients; and film (from his Arizona home or elsewhere) short marketing videos to promote the company on social media; and

(4)     Although Mr. Wouters would have majority membership shares in the Cialdini Institute, Mr. Wouters and Mr. Martinelli would be paid the same management fees to build and operate the company.

29.     Mr. Wouters responded that he had no objection to Mr. Martinelli's conditions, but said he would need to get Dr. Cialdini's approval before going forward.  Within days, Dr. Cialdini approved the plan for Mr. Martinelli to join the new venture as a Partner with Dr. Cialdini and Mr. Wouters, and Dr. Cialdini expressly agreed to "do whatever was necessary" to make the Cialdini Institute a great success.

30.     By May 31, 2022, Mr. Martinelli had provided Mr. Wouters with a detailed schedule for weekly conference calls from June through November 2022 to build and launch the

Cialdini Institute.   Although Plaintiffs had not signed any formal contract or agreements[2] with Dr. Cialdini and Mr. Wouters, Mr. Martinelli immediately mobilized Stickman's entire sales and marketing organization and devoted most of his available time to develop, build-out, and launch the major business operations because he fully trusted Dr. Cialdini and Mr. Wouters to honor their commitments and meet his four material conditions for Partnering with them.

31.     Importantly, a key pillar of Dr. Cialdini's teachings is to be "scrupulously ethical" in the way you deal with partners, customers, clients, vendors and others so Mr. Martinelli never doubted that Dr. Cialdini and his chosen partner, Mr. Wouters, would honor the verbal agreements they made with him.

### Mr. Martinelli Reiterates His Four Conditions for Joining the Partnership

32.     Mr. Martinelli and Mr. Wouters continued discussing the details of their Partnership in June and July 2022, while Mr. Martinelli and Mr. Wouters were already jointly running the daily operations of the company and making key decisions together as to who to hire as staff, teaching faculty and vendors.   Mr. Martinelli was also interviewing and approving the teaching faculty which is one of the most critical responsibilities for creating a successful sales program.

33.     Mr. Martinelli told Mr. Wouters he was willing to invest $1 million, either as a loan or a purchase of membership interests or shares in the Cialdini Institute, but, as stated previously, he would require: (a) a license to sell the Official Cialdini Sales Master Class for at least as long as it would take to recoup his investment of cash, professional time and resources devoted to the project, (b) he would need to have co-manager authority with Mr. Wouters, (c) Dr. Cialdini would

---

[2] Mr. Wouters, Mr. Martinelli and their respective counsel created a Memorandum of Understanding and the parties were in agreement on the major, material terms of the partnership.  Mr. Martinelli also was consulting with Dr. Cialdini and Mr. Wouters and agreeing on all key issues including marketing, pricing, sales strategy, creation of content and member contracts during this time.  Importantly, Mr. Martinelli's efforts were instrumental in generating more than $500,000 in sales for the Institute before any written contracts had been signed.

be required to fulfill his agreed-upon activities including live webinars, live appearances, monthly video appearances, occasional personal emails or call to potential major affiliates or clients, and filming of short marketing videos to promote the company on social media; and (d) Mr. Wouters and Mr. Martinelli would receive the same salary to co-manage and operate the company (hereinafter referred to as "Mr. Martinelli's four conditions.")

34.    Mr. Wouters readily agreed to Mr. Martinelli's four conditions and said he would need to think about, and discuss with Dr. Cialdini, whether to structure the $1 million as a loan or as a purchase of equity in the new company.

**Plaintiffs and Defendants Sign Memorandum of Understanding**

35.    On July 27, 2022, Defendants and Mr. Martinelli signed a Memorandum of Understanding[3] ("MOU") that contained a general outline regarding their initial discussions concerning the possible terms of the "Partnership," stating: "The parties are excited by the prospects of joining forces and believe that the terms set forth in this MOU are a constructive basis to work towards final and legally binding agreements between the parties."

36.    Although the July 27, 2022 MOU was intended only to memorialize in general terms the parties' understanding of the intended Partnership until final agreements could be drafted, the document very clearly documented the agreement between Plaintiffs and Defendants regarding Martinelli's license to sell the Cialdini Master Class program and Dr. Cialdini's agreement to work with Mr. Martinelli "as reasonably required":

> Martinelli currently offers a Sales Master Class. ***In partial consideration of the Loan and the other covenants and agreements set forth herein***, the Cialdini Institute and R. Cialdini will grant Martinelli a license to revise the Sales Master Class to include Cialdini Institute

---

[3] The July 27, 2022 Memorandum of Understanding contains a confidentiality clause so Plaintiffs are not attaching the document hereto.  Defendants have a copy of the MOU and Plaintiffs will file a copy under seal upon request by the Court or the Defendants.

10

and/or R. Cialdini resources to enhance the program to be science-based and feature behavioral science.  The enhanced Sales Master Class will be referred to as "Influence for Sales Featuring Thought Leaders Dr. Robert Cialdini and Paul Martinelli" or similar name agreed upon by the parties (the "Joint Sales Program").  Martinelli acknowledges and agrees that the Joint Sales Program will not be launched until the program is consented to in writing by R. Cialdini and the Cialdini Institute, which consent shall not be unreasonably withheld, denied or delayed. ***R. Cialdini acknowledges and agrees that he will work with Martinelli as may reasonably required to enable Martinelli to finalize the Joint Sales Program.***

Martinelli shall have the right to sell the Joint Sales Program (i) through the Cialdini Institute and Martinelli shall be entitled to receive thirty percent (30%) of the gross sales proceeds generated on the sale of such Joint Sales Program by the Cialdini Institute and the Cialdini Institute shall be entitled to retain seventy percent (70%) of such gross sale proceeds, and/or (ii) to persons not involved with the Cialdini Institute and Martinelli shall pay to the Cialdini Institute an amount equal to twenty percent (20%) of the gross sales proceeds received by Martinelli on the sale of such Joint Sales Program by Martinelli and Martinelli shall be entitled to retain eighty percent (80%) of such gross sales proceeds. The applicable party that has sold the Joint Sales Program will provide a list of the persons who purchased such Joint Sales Program on a quarterly basis or on a more frequent basis as may be agreed to by the parties from time to time.

Unless otherwise agreed to by the Cialdini Institute, ***Martinelli's right to promote the Joint Sales Program as a Cialdini class shall end on the date that is the later to occur of (i) three (3) years after the Loan is made or (ii) sixty (60) days after (a) the Loan is paid in full, or (b) Martinelli receives membership distributions as a member of the Cialdini Institute (as contrasted with compensation for services or for sales of the Joint Sales Program) in an amount equal to One Million and No/100 Dollars ($1,000,000.00) in the event Martinelli exercises his right to convert the Loan in accordance with Section 3 hereof. Notwithstanding such termination of Martinelli's rights to promote the Joint Sales Program, Martinelli will still be entitled to use the Cialdini principles in such class without referencing any affiliations with R. Cialdini or the Cialdini Institute.***

37.     The MOU also stated that: (a) Upon the request of the Cialdini Institute, ***Martinelli will perform certain consultancy services for and on behalf of the Cialdini Institute, for which Martinelli will be compensated separately***, to be agreed upon by the parties; (b) Martinelli will disclose and will make available to the Cialdini Institute his know-how and network of contractors.

38.     Four days after the MOU was signed, on July 31, 2022, Mr. Martinelli emailed Mr. Wouters to say: "I presume we have an engagement contract with me to serve as the building team

of the [Cialdini Institute] program."  Mr. Wouters responded in an August 1 email: "Thanks a lot for your enthusiastic and energetic email.   I feel the same way and everybody from my team is super enthusiastic to work with you and your team as well. . .   Yes, I completely agree."

39.     The July 27, 2022 Memorandum of Understanding expressly stated that: ***"The term of this MOU will continue for a period of thirty (30) days as of the Effective Date [July 27, 2022].***"   However, the parties did not sign final and legally binding agreements by August 27, 2022 and the MOU expired by its own terms.

40.     Finally, the MOU stated that:  "On or before 15 days after the effective date [July 27, 2022]," Wouters shall provide Martinelli and his counsel with drafts of (i) the operating agreement for the Cialdini Institute, (ii) all licensing or similar agreements authorizing the shielding Institute to use Cialdini's materials related to same and any other similar documentation, (iii) all contracts with vendors or affiliates, (iv) any management agreements, employment agreements or live items, and (v) a financial statement for Wouters."   Notably, Mr. Wouters failed to provide any of the required contracts and agreements within 15 days and the MOU expired by its terms on August 11, 2022.   However, as reflected herein, the parties continued operating under the verbal agreement regarding their Partnership while Plaintiffs and Defendants prepared written agreements.

### Plaintiffs Develop a Comprehensive "Buildout Plan" at Curaçao Meetings

41.     To launch their partnership, Plaintiffs and Defendants made plans for Mr. Martinelli, his wife and business partner, Holly Martinelli, and his executive assistant, Megan Keiser, to meet with Mr. Wouters at his vacation home in Curaçao from August 10 to 14 to begin work on the creation of the Cialdini Institute, the buildout plan and launch of the Cialdini Institute

program.  Mr. Martinelli prepared a detailed agenda for the Curaçao meetings and forwarded it to Mr. Wouters.  The agenda was the initial blueprint for Mr. Martinelli's plan to create and launch the Cialdini Institute and Mr. Wouters responded: "I think it looks perfect."

42.     At the conclusion of the Curaçao meetings, Mr. Martinelli prepared and provided Mr. Wouters with a 28-page document with detailed notes documenting the plan for creating and launching the Cialdini Institute.  The Buildout Plan described in great detail the obligations and responsibilities of Plaintiffs, Defendants and Dr. Cialdini for building and launching the Cialdini Institute and the Joint Sales Program, including the activities that Dr. Cialdini would be required to participate in to make the business successful.

43.     Three days after the Curaçao meetings concluded, on August 17, 2022, Mr. Martinelli's executive assistant, Ms. Keiser, emailed a detailed PowerPoint presentation to Mr. Wouters describing the Cialdini Institute Buildout Plan.

44.     On August 23, 2022, Dr. Cialdini, his wife and business partner, Bobette Gordon, Mr. Wouters and Mr. Martinelli attended a conference call via Zoom to review Mr. Martinelli's detailed PowerPoint presentation describing the Cialdini Institute Buildout Plan created by the Plaintiffs.  Dr. Cialdini and his wife enthusiastically approved Mr. Martinelli's presentation for the Cialdini Institute Buildout and their Partnership.   As stated by Dr. Cialdini's wife in an email: "The more we talked, the more synapses I could feel exploding."

45.     Mr. Martinelli followed up on August 24, 2022 with a detailed email to Mr. Wouters discussing the various financial terms for his Partnership with Mr. Wouters and Dr. Cialdini:

> "I am very open to either loaning you a million dollars so you have the capital for the launch and trust that you will reward me for the value I bring, or

giving you a million dollars and buying a percentage of the business, we had discussed 22% originally. . .  I am not in a position to give an additional million dollars as a line of credit and receive no interest on the investment. . . I am fine with giving a million for the 22% and I am fine with paying Dr. Cialdini his million dollars from the funds we generate, as well as the funds you have already invested and the value of your time thus far.   That being said, I think we should stagger these payments so everyone realizes some type of financial win from the launch after working for 9 months. . . If we can't come to an agreement on the partnership, then we can just move forward with the loan agreement and keep the ball rolling.  I will need to draw a salary to cover my time during the building phase. . . [T]his is going to take a lot of our time and we should establish a common amount we each receive moving forward so we can plug in real numbers for our pro forma and budget."

46.     Mr. Wouters responded by email on August 25, 2022, stating:  "From my point of view this is a great starting point to finalize our partnership.  I have some ideas which I would like to share with you tomorrow and I think we can shake hands on our partnership really soon. :)".  Mr. Wouters agreed that he and Mr. Martinelli would each be entitled to the identical annual salary as co-managers of the company and Mr. Wouters proposed $40,000 per month, or $480,000 annualized.

47.     The next day, Mr. Wouters emailed an associate to introduce him to Mr. Martinelli and confirmed how excited he was to have Mr. Martinelli as his "business partner":

"Paul is an amazing entrepreneur!  Since 2006 he has built the most amazing business together with world class Thought Leaders.  He was a partner of Bob Proctor in the launch and globalization of "The Secret".  As you probably know, they conquered the world! 😊. Another amazing achievement from Paul is building the "John Maxwell Team. From 2010 to 2020, Paul built a business from nothing to (again) a globally operating machine with over 40,000 coaches in 161 countries.  Dr. Cialdini and myself are very pleased to work with him. So . . . *I am really proud to say Paul [Martinelli] is not only a friend, he is also a business partner with me and Dr. Cialdini to build Dr. Cialdini's legacy.*"

48.     Although Plaintiffs and Defendants had not finalized all of the terms of their partnership agreement, Defendants and Dr. Cialdini had repeatedly represented to Mr. Martinelli

that they agreed to Mr. Martinelli's four conditions to join as a Partner with Dr. Cialdini and Mr. Wouters in the Cialdini Institute.  In reasonable reliance on these representations, Mr. Martinelli had mobilized Stickman Productions, his team of employees, and third-party vendors and began the hundreds of hours of work required for the buildout and launch of the Cialdini Institute.

### Plaintiffs Work Intensively on the "Buildout" of the Cialdini Institute

49.     On August 28, 2022, Mr. Wouters asked to schedule a conference call with Mr. Martinelli's content team and Stickman Productions employees to move forward preparing scripts, designs and instruction videos for the Cialdini Institute.

50.     Mr. Martinelli prepared an Agenda for an August 30 conference call with Mr. Wouters to discuss the Cialdini Institute's domain, creation of email addresses for Mr. Martinelli and his Team, contracts and compensation for the writers who would draft the content, and various other initial steps in the buildout of the Cialdini Institute.

51.     Although Mr. Martinelli and his Team were working virtually full-time on the creation and buildout of the Cialdini Institute in reliance on the representations by Mr. Wouters and Dr. Cialdini that Mr. Martinelli would be their Partner in the Cialdini Institute, no formal partnership agreement had been drafted or signed as of September 2022.

52.     Mr. Wouters emailed Mr. Martinelli and responded to his August 24 email with the following "redline" comments regarding the terms of the Partnership between Dr. Cialdini, Mr. Wouters and Mr. Martinelli:

- I am very open to either loaning you a million dollars so you have the capital for the launch and trust that you will reward me for the value I bring, or giving you a million dollars and buying a percentage of the business, we had discussed 22% originally.  *My advisors will never let me sign this agreement. . It is more extensive then a contract with a bank.  Still an option with another contract.  I think not the preferred option for the both of us.*

- I am not in a position to give an additional million dollars as a line of credit *and receive no interest on the investment.*

- If we can't come to an agreement on the partnership, then we can just move forward with the loan agreement and keep the ball rolling. *I prefer a partnership over a loan. For short or long term motivation to build equity value (remember CDI) and shared profit.*

- I will need to draw a salary to cover my time during the building phase. *(Agree, we both need).*

53.    On October 18, 2022, Mr. Wouters finally sent Mr. Martinelli three rough draft contracts — Cialdini Institute LLC Agreement; Management Services Agreement; and IP License and Conditional Transfer Agreement — for consideration.

**Mr. Wouters Begins Pressuring Plaintiffs to Send Money to Defendants**

54.    On October 23, 2022, Mr. Wouters emailed Mr. Martinelli an Agenda for their scheduled conference call on October 25 and began pushing Mr. Martinelli to send his $1 million partnership investment:   "Our deal — ***Invoices keep coming in and I like to get some clarity on the cash position of myself and Cialdini Institute***.  I am also happy to move forward on your loan offer."

55.    On or about November 4, 2022, — even though the Cialdini Institute had not even been incorporated yet — Mr. Wouters advised Mr. Martinelli that he needed capital to continue working on the creation and buildout of the Cialdini Institute and requested that Mr. Martinelli wire an initial payment of $150,000 to the Cialdini Institute pending their signing formal Partnership Agreements.  In reliance on the representations by Mr. Wouters and Dr. Cialdini that Mr. Martinelli would be their Partner in the Cialdini Institute with agreement to Mr. Martinelli's four conditions, Mr. Martinelli wired $150,000 to the Cialdini Institute as a partial payment

towards the $1 million loan or equity investment in the Cialdini Institute

56.     Meanwhile, in reliance on the representations by Mr. Wouters and Dr. Cialdini that Mr. Martinelli would be their Partner in the Cialdini Institute, Mr. Martinelli and his Team of employees at Stickman Productions and third-party vendors had been working daily from June to November creating and building out the Cialdini Institute's structure and program.

57.     By late November 2022, in addition to the $150,000 he wired to the Cialdini Institute, Mr. Martinelli and his Team had spent hundreds of hours creating and building out the Cialdini Institute's program and had incurred thousands of dollars in out-of-pocket expenses in reliance on the representations by Mr. Wouters and Dr. Cialdini that Mr. Martinelli would be their Partner in the Cialdini Institute on the agreed-upon four conditions required by Mr. Martinelli.

**Plaintiffs Visit Mr. Wouters for Second Curacao Meeting to Discuss Partnership**

58.     To address the Partnership Agreement and many other topics, Mr. Martinelli and his wife, Holly, made plans to meet with Mr. Wouters for a second time at his vacation home in Curaçao from December 28, 2022 to January 3, 2024.   Two days before the Curaçao meetings, Mr. Wouters finally sent Mr. Martinelli the Cialdini Institute LLC Agreement between Dr. Cialdini and Mr. Wouters; proposed IP License and Conditional Transfer Agreement; Mr. Wouters ' Management Services Agreement and a Consultancy Services Agreement.

59.     Mr. Martinelli and Mr. Wouters had extensive discussions regarding the Partnership agreement at the Curaçao meetings and Mr. Wouters agreed to review the issue with his attorney and get back to Mr. Martinelli with revised Partnership Agreements by January 31, 2023.

60.      Mr. Wouters and Mr. Martinelli further agreed that a pro forma budget would be created for the Cialdini Institute and that Mr. Martinelli and Mr. Wouters would have full management authority to spend up to 15% above the budgeted amounts, but that Mr. Wouters and Mr. Martinelli would need specific approval from each other to exceed those budgeted amounts by more than 15%.   They also discussed an agreed-upon share of the distributions of net income from the Cialdini Institute after the company was launched.

61.      On February 9, Mr. Martinelli's attorney emailed Mr. Wouters 'attorney requesting a Word version of the Cialdini Institute's Operating Agreement, stating "I understand that the parties have agreed that we should mark-up same to reflect Stickman's status as a member and other matters."

### Defendants Induce Plaintiffs to Wire More Cash and Pay More Expenses

62.      Despite the absence of signed Partnership Agreements, Mr. Wouters continued pushing Plaintiffs to pay the Cialdini Institute's operating expenses required for the buildout and launch of the company and the Sales Program.   On February 19, 2023, Mr. Wouters emailed to advise that his credit card was being charged for all of the Cialdini Institute's advertising accounts (Google, Facebook, Linked In, etc.) and asked Plaintiffs to use their credit cards to pay the Cialdini Institute's ongoing operational expenses:   "Do you have a card we can use or do we need to apply for a credit card for Cialdini Institute."

63.      On February 27, 2023, Mr. Martinelli emailed Mr. Wouters with a report on Plaintiffs' progress on the buildout and launch of the Cialdini Institute and the Joint Sales Program. Yet again, Mr. Martinelli confirmed with Mr. Wouters that they would co-manage the company's finances and budget, stating:  "you and I will have to approve all bills."

64.     On February 28, 2023, although there still was no finalized Partnership Agreement, Mr. Wouters emailed Mr. Martinelli's executive assistant and asked her to have Mr. Martinelli and his Sales Team start working and communicating with cialdini.com email addresses.

65.     On March 4, 2023, although there still was no finalized Partnership Agreement, Mr. Wouters emailed Mr. Martinelli's executive assistant to say "Paul and I agreed there would be another transfer of $100,000" to the Cialdini Institute "because contracts take a little bit longer as expected." Two days later when the funds had not been received, Mr. Wouters emailed Mr. Martinelli and wrote: "I checked some balances and outstanding invoices yesterday and it would be great if you see a possibility to transfer this week."

66.     Although he had concerns about the Defendants 'failure to sign final Partnership Agreements, Mr. Martinelli authorized the wire of an additional $100,000 to the Cialdini Institute because he completely trusted Dr. Cialdini and Mr. Wouters.

67.     On March 11, 2023, Mr. Wouters again wrote Mr. Martinelli's executive assistant to ask if she had established a U.S.-based credit card to pay the Cialdini Institute's advertising accounts and complaining that he was paying each month for software charges, stating "To me it makes sense to connect the US card for these expenses as well."

**Mr. Wouters' Troubling Problems with U.S. Immigration and Substance Abuse**

68.     Some time in late 2022, Mr. Wouters had scheduled to fly from the Netherlands to meet with Dr. Cialdini at his Arizona home. Mr. Wouters later told Mr. Martinelli that he "had a lot of drinks" on the lengthy overseas flight which led to a verbal altercation with U.S. Customs agents at Minneapolis International Airport.

19

69.     According to Mr. Wouters' account of the incident, the Customs agents began to question him about his frequent trips to the United States and asked if he was working here and whether he had a business visa, etc.  When the Customs agents asked to examine Mr. Wouters' cellphone, Mr. Wouters refused and (apparently) became belligerent because the Customs agents placed Mr. Wouters in the airport's "drunk tank" so he would sober up.

70.     During the altercation, Mr. Wouters told the Customs agents that his business partner (Dr. Cialdini) had worked on the Barack Obama and Hillary Clinton Presidential campaigns and was personal friends with former President Obama, etc.  The Customs agents possibly interpreted Mr. Wouters' comments as a veiled threat because when Mr. Wouters was released from the airport holding cell, U.S. Customs refused to grant him permission to enter the United States and he was immediately placed on a return flight to Holland.

71.     Mr. Wouters' altercation with U.S. Customs and his resulting immigration problems are so serious that Mr. Wouters has not been permitted to re-enter the United States for more than one year.   According to Mr. Wouters, he has met with State Department officials at the American Embassy in Curaçao and was told that he must first be examined and evaluated by a State Department-approved psychiatrist before he could be considered for a visa to enter the United States.

72.     Upon information and belief, as of the date of this Complaint, the U.S. State Department has still barred Mr. Wouters from entering the country pending his mental evaluation by an approved psychiatrist and re-application for a visa.

**Mr. Wouters' Struggles with Alcohol Begin to Cause Significant Problems**

73.     Between February and May 2023, Plaintiffs continued working on the buildout and upcoming launch of the Cialdini Institute Sales Program, but began to notice a pattern of Mr. Wouters canceling more than a dozen scheduled leadership team meetings or other important appointments due to a variety of excuses, including repeated claims of "food poisoning" or "detox" or "feeling unwell" or "personal circumstances" or "no Wi-Fi," etc.

74.     At Mr. Wouters' request, Mr. Martinelli and Charlotte Hall, a senior member of his Executive team, traveled to the Netherlands for two days of meetings (on February 3 and 4, 2023) with Mr. Wouters and his Holland team to finalize the buildout and plans for the upcoming launch of the Cialdini Institute Sales Program.

75.     Although Mr. Martinelli had traveled from Florida to Holland and Ms. Hall had traveled from South Africa to Holland at Mr. Wouters' request for two full days of meetings, Mr. Wouters said he was too hungover from a night of drinking and showed up four hours late to the first day of meetings.   At a planned team dinner, Mr. Wouters again failed to appear at the scheduled time and had to be called out from his hotel room where he was asleep.

76.     Mr. Wouters had made plans to drive Mr. Martinelli to the airport so they would have some private time to discuss company business and the upcoming launch but, incredibly, Mr. Wouters again was apparently hungover and failed to show up.

77.     In mid-April 2023, Mr. Martinelli and his wife, Holly, had made special plans to renew their wedding vows in a private ceremony at the Sistine Chapel in Rome.  Mr. Martinelli invited Mr. Wouters and his longtime girlfriend and a number of work colleagues and friends to join them in Rome for the ceremony and festivities.

78.     Mr. Wouters and his girlfriend began drinking alcohol at 10 a.m. and continued until late in the afternoon when Mr. Wouters and his girlfriend had a loud fight that ended around 5 p.m. when police and paramedics were called to the hotel.   Mr. Wouters' girlfriend was taken by ambulance to a local hospital for detoxication.

79.     One week after the alcohol-related incident in Rome, Mr. Martinelli was hosting a client event in Belgium to promote the Cialdini Institute's upcoming launch.  Mr. Martinelli and Mr. Wouters were scheduled to speak to the group in the morning, but again Mr. Wouters got heavily intoxicated in the hotel bar and made inappropriate comments to one of Mr. Martinelli's longtime clients.  Several attendees commented to Mr. Martinelli about Mr. Wouters' excessive drinking.

80.     After the event, Mr. Martinelli privately raised the issue with Mr. Wouters, stating that his behavior was unprofessional and that he appeared to have a serious drinking problem.  Mr. Wouters admitted to both Mr. Martinelli and another colleague that he realized his drinking had "gotten out of hand" due to business stress the past year and that he was looking into some kind of executive coaching for substance abuse problems.  He assured Mr. Martinelli that he was going to seek coaching or other treatment for his substance abuse problem.

81.     Although Mr. Martinelli was sympathetic to Mr. Wouters' situation, he also was concerned that his business partner obviously had serious problems with substance abuse.

82.     However, Mr. Wouters had agreed in their earliest meetings that Mr. Martinelli would have co-equal management authority in the Cialdini Institute, they had been operating the company on that basis for the prior 11 months, and Mr. Martinelli was confident he could manage the situation despite Mr. Wouter's personal struggles.

**Plaintiffs Successfully Launch the Cialdini Institute on a Global Basis**

83.     Despite Mr. Wouters' alcohol and immigration problems and the absence of finalized and signed Partnership Agreements, Mr. Martinelli and his Sales Team were laser focused on completing the buildout plan for the Cialdini Institute and managing all of the logistical and operational details to successfully launch the company's sales program.

84.     To create a test run and to begin building momentum for the official launch of the Cialdini Institute Sales Program, Plaintiffs scheduled and successfully executed a "soft launch" of the program directed solely at a select group of Mr. Martinelli's Empowered Living Client's on March 21, 2023 (the so-called "Inner Circle" launch).

85.     Plaintiffs set a goal of generating $200,000 in sales through the "soft launch," but exceeded that goal with more than $312,000 in sales.  Equally important, the soft launch generated publicity and momentum for the Cialdini Institute brand in advance of the official launch scheduled for June 2023, including adding 10,000 new connections on Cialdini's LinkedIn profile.

86.     Dr. Cialdini and Mr. Wouters were both thrilled with the results.  Dr. Cialdini wrote:  "This is terrific news!  I don't want to get too optimistic about future outcomes, because the audience for the soft launch last week wasn't a representative sample of the larger audiences we hope to persuade; but, even so, these are outstanding results."   Mr. Wouters emailed Mr Martinelli:  "Hey Paul.  Thanks for the sales update with great results.  It gives a lot of energy and confidence towards the future."

87.     Plaintiffs scheduled an important follow-up leadership call with Mr. Wouters two days after the soft launch, but again Mr. Wouters canceled at the last minute:  "I'm having a fever and can't attend today's meeting."   The following week, Mr. Wouters again advised he was not

able to attend an important planning meeting: "I have to go to the US Embassy for my visa."

88. Despite Mr. Wouters' continuing personal and immigration issues, Mr. Martinelli and his team continued their sales, marketing and planning efforts to build interest and momentum for the official launch of the Cialdini Sales Program scheduled for June.

89. On April 6, 2023, Dr. Cialdini wrote an influential podcaster and Thought Leader who had the connections to generate significant sales and confirmed Mr. Martinelli's key role in the company, stating: ***"Paul is the person handling the business side of what we are planning for the Cialdini Institute*** . . . I've cc'd Paul on this message so he can reach out to you to discuss the prospects of collaboration."

### Mr. Wouters' Misrepresentations and Scheme to Take Plaintiffs' Money

90. During the critical weeks after the soft launch, Plaintiffs were busy analyzing results from the soft launch and revising and improving plans for the official launch, but Mr. Wouters was focused on getting more "funding" from Mr. Martinelli and transferring the revenue from the soft launch to his bank account.

91. Mr. Wouters repeatedly failed to pay company invoices and then forwarded them to Plaintiffs for payment, such as a $32,000 unpaid invoice from an important vendor.   While Mr. Wouters was attempting to transfer the Cialdini Institute's bills and liabilities to Plaintiffs, he simultaneously moving to retain any revenue generated by the Plaintiffs' sales efforts.

92. Mr. Wouters repeatedly asked Mr. Martinelli to send him all of the revenue received through Plaintiffs' credit card sales from the soft launch.  On May 19, Mr. Wouters emailed: "Can you let me know when you will be transferring the revenue from the inner circle Launch?  Please see below the bank details [Mr. Wouters' wire instructions]."

93.     During the initial meetings in Florida and in many later conversations, Mr. Wouters had represented to Plaintiffs that he had invested substantial time and capital in the Cialdini Institute which he stated was roughly equal to the $1 million he was asking Mr. Martinelli to invest in the company.  Mr. Wouters described this investment as his "legacy" capital which was used as the benchmark to set an ownership value for Mr. Martinelli's $1 million investment and stake in the Cialdini Institute.

94.     When the Cialdini Institute began generating revenue after the soft launch in March 2023, Mr. Martinelli's business accountant advised him to create a Quickbooks account for the Institute to record all revenue and expenses to account for tax purposes starting in May 2023.   On April 13, 2023, Mr. Martinelli's financial officer emailed Mr. Wouters asking him to "share a summary of investment/income/expenses that you've been holding to date, and then we can overlay the income that's currently being tracked in the [Plaintiffs' Empowered Living] accounts."

95.     Mr. Wouters ignored the request for a full week and, when prompted by a follow up call, wrote a response on April 20, 2023 that was nonsensical and evasive:  "I think the starting balance is connected to the contracts.  For now, I would suggest Bruce [Plaintiffs' accountant] has a starting balance with everything on USD 0 — and we correct after finalizing the contract."

96.     Upon information and belief, Mr. Wouters materially misrepresented to Plaintiffs the extent of his alleged investment of time and capital of $1 million in the Cialdini Institute in order to induce Mr. Martinelli to invest more than $1.4 million in capital, operating expenses and professional time to build and launch the Cialdini Institute for the Defendants' financial benefit.

**Defendants Pressure Plaintiffs to Transfer the Revenue from the Soft Launch**

97.     By mid-May 2023, Plaintiffs had: (a) wired $450,000 in cash to Defendants and committed to investing a total of $1 million; (b) paid hundreds of thousands of dollars in operating expenses; (c) retained the entire sales team and paid them commissions out-of-pocket without reimbursement; (d) created virtually all of the content and structure of the Cialdini Sales Program, including videos of Dr. Cialdini; (e) traveled multiple times to Arizona, Curacoa, the Netherlands and elsewhere to buildout and execute the successful soft launch and the planned official launch of the Cialdini Sales Program;  (f) invested hundreds of hours of Mr. Martinelli's valuable time managing the complex plan to create, promote and launch the Cialdini Sales Program; and (g) coordinated and managed a large team of sales and operational personnel to buildout and launch the Cialdini Institute and the Sales Program.

98.     Although there still were no final written partnership agreements signed by the parties, Plaintiffs had invested substantial money, resources and time in reasonable reliance on the repeated and express agreements to Mr. Martinelli's four conditions from the Defendants and Dr. Cialdini.  Equally important, Mr. Martinelli felt a tremendous obligation to ensure the success of the Cialdini Institute and Sales Program for his many clients — including close friends and even family members — who had invested money and many hours of time in the Program based on their trust in him.

99.     However, on May 19, 2023, when Mr. Wouters began to pressure Plaintiffs to transfer to Defendants all of the revenue generated from the soft launch of the Cialdini Sales Program and Mr. Wouters suspiciously refused to provide financial information regarding his own investment of capital and his operating expenses, Mr. Martinelli became concerned and emailed

Mr. Wouters:

> "We need to discuss this transfer with [the accountant], and we cannot spend a penny of this money until we have the program launch with the resources promised.   The funds legally should be in a lawyers escrow account. . . We should also now set up our own books and get this done through [the accountant] so we aren't running funds from your account, an account in Arizona and then funds in Florida.  We are close enough to the launch that we should set up our account asap and have you on Zoom with [the accountant] and the bank.  ***We also need the accounting for what has already been spent.  I believe I have funded over three hundred thousand to date, and we need to get those funds posted in our books.***  If we need some operational cash now, I can fund the account with another hundred thousand to tie us over until the June launch, less than thirty days away.  I can have this payment dropped into the new account so it is done properly for accounting. . . You and I do not want to go to jail over mismanagement of funds!  . . .  I think we are far enough along in our contract that we both feel comfortable with all our next steps, and once we sign the final agreement I can then fund the final balance and we will be on our way."**

100.    Mr. Martinelli's refusal to transfer the revenue from the soft launch to the Defendants, his request for Defendants' financial and accounting records, and his insistence on signing partnership agreements to memorialize his four conditions that had previously been agreed to by the Defendants forced the Defendants to finally produce written contract terms.

### Defendants Renege on the Key Terms of the Parties' Longstanding Agreements

101.    In early June 2023, nearly a full year after Defendants and Dr. Cialdini expressly agreed to Mr. Martinelli's four conditions, continuously operated the Cialdini Institute based on those express agreements, and induced the Plaintiffs to invest more than $1.4 million in cash, operating expenses and unpaid professional time to build and launch the Cialdini Sales Program, Defendants unilaterally changed the material terms of the parties' agreements and presented proposed written agreements that were unacceptable.

102.    Specifically, Defendants for the first time insisted that:

(a)      Mr. Wouters — an admitted alcoholic with serious immigration problems that

barred him from even entering the United States — would have "the final say regarding the management of [the Cialdini Institute] . . . The final responsibility and say with respect to the management is with [Mr. Wouters]";

(b)      Mr. Wouters and Mr. Martinelli "will have different management responsibilities in [the Cialdini Institute], resulting in different 'job descriptions' in the management agreements *as well as different compensation*.";

(c)      Defendants would not grant Plaintiffs an exclusive license to the official Cialdini Sales Program — which the Plaintiffs had designed and created — and Defendants would retain all rights to have a "similar" program; and

(d)      Defendants would retain "majority rights" in the Cialdini Institute and would have unfettered control of all management and other decisions, including the unconditional right to bring in new "partners" without Plaintiffs' input or consent; and

103.      Plaintiffs immediately responded that the Defendants' new terms and conditions for the partnership were unacceptable, and the parties agreed to schedule conference calls with their attorneys in an effort to resolve their differences.

104.      To make matters more difficult, the Defendants' surprising attempt to radically change the terms of their prior agreements came just weeks before the official launch of the Cialdini Institute's Sales Program scheduled for June 17, 2023.

105.      After investing so much money, resources and professional time for more than one year building and planning for the official launch, Plaintiffs decided to continue working to resolve their major disagreements while going forward with the intensive work necessary to execute a successful launch of the Cialdini Sales Program.   More importantly, by early June 2023, Mr.

Martinelli had already encouraged so many clients and friends to invest their time and money in the Program that he felt a moral obligation to complete a successful launch so his clients and friends did not suffer.   For Mr. Martinelli, withdrawing from the partnership at the "eleventh hour" would hurt his trusting clients, friends and employees and he was not willing to do so.

106.    On June 6, 2023, Plaintiffs wired another $100,000 in cash to the Defendants to fund the imminent launch of the Cialdini Sales Program.   Defendants also asked Plaintiffs to pay a $32,000 vendor invoice that Defendants had failed to pay since mid-May.

### Plaintiffs Successfully Launch the Official Cialdini Sales Program

107.    In mid-June, 2023, after more than a full year of intensive work and planning, Plaintiffs managed a successful official launch of the Cialdini Sales Program to a global audience. Through late June, the Cialdini Sales Program had generated roughly $800,000 in sales.

108.    Unfortunately, Plaintiffs encountered many conflicts and problems with the Defendants before, during and in the weeks after the official launch.

109.    Mr. Martinelli sent multiple emails to Mr. Wouters raising these operational and management conflicts, but ultimately decided the parties needed to make one last attempt to resolve their differences.

### Defendants Disclose Shocking News that Dr. Cialdini Has Terminal Cancer

110.    During a conference call on July 31, 2023, Mr. Wouters disclosed for the first time that Dr. Cialdini was suffering with terminal cancer and his prospects for survival were grim.   This devastating news was not only personally upsetting to Mr. Martinelli, but was professionally devastating.

111.    Plaintiffs had invested more than $1.4 million in cash, time and resources for more than one year to create, build and launch the Cialdini Sales Program, which expressly committed Dr. Cialdini to personally provide important services in exchange for the purchase of the various programs.

112.    The Cialdini Certification Programs expressly required the Cialdini Institute to provide 6 live interactive calls per year with Dr. Cialdini and four live "client invitation" calls per year with Dr. Cialdini (at which Members can invite their own clients to the live calls with Dr. Cialdini who then direct those clients to speak further with the Members to learn more about training on Dr. Cialdini's principles of persuasion.)

113.    Mr. Martinelli immediately advised Mr. Wouters that it was problematic to be selling the Cialdini Certification Program promising these personal live calls with Dr. Cialdini if Dr. Cialdini's serious medical condition may prevent him from fulfilling these promises to paying clients.

114.    Mr. Wouters also advised Mr. Martinelli for the first time during the call that ***Dr. Cialdini insisted*** that Mr. Wouters must have full management control of the Cialdini Institute and that Mr. Martinelli would not be co-managing the business or, in fact, have any authority to make decisions for the company.   Mr. Wouters claimed that Dr. Cialdini told him that, because he had terminal cancer, he wanted Mr. Wouters to have full control of all management decisions since Dr. Cialdini would no longer be able to serve as the "tie-breaker" in the event that Mr. Wouters and Mr. Martinelli had any disagreements regarding management decisions.

115.    For many months, Mr. Martinelli had become frustrated and disappointed by Mr. Wouters' constant habit of canceling appointments and commitments; engaging in inappropriate

and embarrassing conduct due to his substance abuse problems; demanding more operational cash and shifting the company's expenses to the Plaintiffs; allowing incompetent members of his Holland team to make critical decisions; and failing to properly execute his responsibilities to the company.  Consequently, Mr. Martinelli had no intention of continuing to invest his time and money in a company solely managed and controlled by Mr. Wouters.

116.    At the conclusion of the July 31 conference call, Mr. Martinelli emailed Mr. Wouters advising him that he was withdrawing from the "partnership," but that they would convert to a loan agreement all of the cash, operating expenses, and the more than 700 hours that Mr. Martinelli had personally invested in building and launching the Cialdini Institute.

117.    Although he believed Defendants had breached their longstanding agreements with him and unilaterally changed the terms of how they had been co-managing the business since day one, Mr. Martinelli offered to help transition the business so as to avoid any harm to Mr. Wouters, the Cialdini Institute and "Dr. Cialdini's legacy."

**<u>Defendants Refuse To Reimburse Plaintiffs for Their Money and Services</u>**

118.    Plaintiffs provided Defendants with a detailed accounting — including supporting spreadsheets, time sheets, invoices, and other requested documentation — of the more than $1.4 million in cash, operating expenses and Mr. Martinelli's more than 700 hours of time creating, building and launching the Cialdini Institute and its Sales Program.

119.    Defendants and Dr. Cialdini continue to operate and profit from the Cialdini Institute and its Sales Program that were substantially built and launched through the Plaintiffs' expertise, cash, and time, but have failed and refused to reimburse the Plaintiffs despite repeated demands.

31

120.     Plaintiffs have suffered and will continue to suffer substantial damages as a direct and proximate result of Defendants' wrongful conduct.

## COUNT I -- UNJUST ENRICHMENT

121.     Plaintiffs re-allege and incorporate by reference herein the allegations in Paragraphs 1 through 120.

122.     Plaintiffs have conferred benefits on the Defendants, who had knowledge thereof.

123.     Defendants voluntarily accepted and retained the benefits conferred by the Plaintiffs.

124.     The circumstances are such that it would be inequitable for the Defendants to retain the benefits without first paying the value thereof to the Plaintiffs.

## COUNT II – PROMISSORY ESTOPPEL

125.     Plaintiffs re-allege and incorporate by reference herein the allegations in Paragraphs 1 through 120.

126.     Defendants made promises and representations to Plaintiffs that were definite and of a substantial nature.

127.     Defendants made promises and representations to Plaintiffs as to material facts that are contrary to the Defendants' later-asserted positions.

128.     Plaintiffs reasonably relied on the Defendants' promises and representations.

129.     Defendants reasonably expected their promises would induce and they did, in fact, induce Plaintiffs to provide Defendants with more than $1.4 million in cash, payment of Cialdini Institute's operating expenses,  and services.

130.     Plaintiffs changed their position and took action detrimental to the Plaintiffs in

reasonable reliance on the Defendants' promises and representations

131.    Defendants caused the Plaintiffs to suffer damages in detrimental reliance on the Defendants' promises and representations made to the Plaintiffs.

132.    Injustice can be avoided only by enforcement of the promises made by Defendants to the Plaintiffs or by requiring the Defendants to repay the more than $1.4 million  in cash, payment of Cialdini Institute's operating expenses, and services provided by the Plaintiffs.

## COUNT III – CONVERSION

133.    Plaintiffs re-allege and incorporate by reference herein the allegations in Paragraphs 1 through 120.

134.    Defendants took possession of the Plaintiffs' money and other valuable property including, but not limited to, $500,000 in cash wire transfers, payments of the Cialdini Institute's operating expenses, and the Plaintiffs' intangible interests in the Cialdini Institute and the Joint Sales Program.

135.    Plaintiffs' money and property consisted of specific money and property capable of identification and Defendants were obligated to keep the money and property intact.

136.    Defendants have wrongfully asserted dominion and control over the Plaintiffs' money and other valuable property. Defendants have wrongfully deprived the Plaintiffs of possession of their money and valuable property to which Plaintiffs are rightfully entitled.

137.    Plaintiffs have a right to possession of the more than $1.4 million in money and valuable property and services over which Defendants continue to wrongfully assert dominion and control.

138.    Plaintiffs have repeatedly demanded that Defendants return and repay the Plaintiff'

money and valuable property, but Defendants have refused to do so.

139.    Defendants have the present intent to permanently deprive the Plaintiffs of

possession of their money and other valuable property.

140.    Plaintiffs have suffered damages caused by Defendants wrongful exercise of

dominion and control over the Plaintiffs' money and valuable property.

Dated: January 26, 2024                    Respectfully submitted,

                                           SCHWED KAHLE & KRESS, P.A.
                                           11390 North Jog Rd. Suite 102
                                           Palm Beach Gardens, FL 33418
                                           Phone: (561) 694-0070 Fax: (561) 694-0057

                                           By: */s/ Lloyd R. Schwed*
                                                   Lloyd R. Schwed, Esq.
                                                   Florida Bar No.: 508713
                                                   lschwed@schwedpa.com
                                                   Douglas A. Kahle, Esq.
                                                   Florida Bar No.: 0141194
                                                   dkahle@schwedpa.com